886 So.2d 27 (2004)
Anthony McGRUDER, Appellant
v.
STATE of Mississippi, Appellee.
Nos. 2003-KA-00689-COA, 2001-CT-01542-COA.
Court of Appeals of Mississippi.
June 22, 2004.
Rehearing Denied August 31, 2004.
*28 Belinda J. Stevens, Jackson, attorney for appellant.
Office of the Attorney General by Jeffrey A. Klingfuss, attorney for appellee.
Before SOUTHWICK and BRIDGES, P.JJ., and MYERS, J.
MYERS, J., for the Court.
¶ 1. This case comes before this Court on remand from the Mississippi Supreme Court. Our first opinion dismissed *29 McGruder's claim as time-barred. We now review the merits of McGruder's claim. McGruder raises the following three issues on appeal.

ISSUES PRESENTED
I. Was the verdict against the overwhelming weight of the evidence?
II. Did the State commit reversible error during its closing argument by making improper remarks which appealed to the bias and prejudice of the jurors?
III. Did the cumulative effect of the enumerated errors deny the appellant a fundamentally fair trial?

FACTS AND PROCEDURAL HISTORY
¶ 2. The facts of this case were recited in our first opinion, McGruder v. State, 835 So.2d 104 (Miss.Ct.App.2003). During the early morning hours of June 23, 1998, a fire was started at 617 Grady Avenue in Yazoo City, Mississippi. Upon entering the house in an effort to extinguish the fire, the firefighters discovered two charred bodies inside the house. Investigations identified the bodies as Daisy Shinal and Willy Dixon, an elderly brother and sister who lived with Anthony McGruder, the grandson of Daisy Shinal. Autopsies conducted on the remains indicated that Shinal and Dixon died two to four days before the fire. The autopsies showed that Shinal died as a result of strangulation and Dixon died as a result of blunt force trauma to his head.
¶ 3. After the Yazoo City Police Department interviewed several witnesses, McGruder became the primary suspect in the investigation. During questioning by the police, McGruder confessed to having a "confrontation" with Dixon and Shinal. McGruder stated that he pushed Shinal, his seventy-eight year-old grandmother. McGruder told police that he also pushed Dixon, making the elderly man fall to the floor. McGruder told police that as a result of the blow, blood came from Dixon's head and that he dragged Dixon down the hallway into a bedroom.
¶ 4. McGruder was indicted for two counts of murder and one count of arson in violation of Mississippi Code Annotated Sections 97-3-19(1)(a) and 97-17-1 (Rev.2000). During McGruder's trial, Deputy Fire Marshal Carl Rayfield and Yazoo City Fire Marshal James Jackson testified that piles of clothes were placed over Shinal and Dixon and set afire. The only sign of forced entry was the front door. Herbert Grayson, a neighbor, testified he and two others tried to enter the house through the door because of the fire. They were not able to gain entry into the house. On November 29, 2000, McGruder was found guilty on all counts and was sentenced to serve a term of two life sentences for the murders to be served concurrently and ten years for the arson to be served consecutively with the life sentences in the custody of the Mississippi Department of Corrections.
¶ 5. McGruder's trial counsel filed a JNOV on March 15, 2001. McGruder then filed a pro se motion to appoint new counsel on July 11, 2001. New appellate counsel was appointed on September 7, 2001. McGruder's new counsel filed a motion for JNOV which was denied. A notice of appeal was filed on September 26, 2001. McGruder also filed an out-of-time appeal on November 19, 2001 which was dismissed on December 20, 2001.
¶ 6. This Court rendered an opinion on January 21, 2003, dismissing McGruder's appeal as time-barred. McGruder v. State, 835 So.2d 104 (Miss.Ct.App.2003), cert. granted, 847 So.2d 866 (Miss.2003). We held that Rule 4(e) of the Mississippi Rules of Appellate Procedure instructs that a party has thirty days from the entry *30 of the order denying either a motion for a judgment notwithstanding the verdict or a motion for new trial to file his notice of appeal. Id. at 105(¶ 6). We addressed the fact that the thirty-day rule is not absolute; however, since McGruder filed his appeal after the thirty days and did not receive permission to file an out-of-time appeal, his claim was time-barred. Id. at (¶ 8).
¶ 7. The Mississippi Supreme Court granted McGruder's petition for writ of certiorari to review our decision. The court held that Rule 4 may be suspended "when justice demands" and allowed McGruder's out-of-time appeal. McGruder v. State, 2001-CT-01542-SCT, 2003-TS-00689 (¶ 4), 886 So.2d 1, 2003 WL 22100126 (Miss. Sept. 11, 2003). The Court emphasized the fact that McGruder was denied his right to perfect his appeal within the time prescribed by law due to actions by his trial counsel. Id. (citing Jones v. State, 355 So.2d 89, 90 (Miss.1978)). The Supreme Court remanded the case to this Court for a decision on the merits of McGruder's claim. Finding no error, we affirm the judgment of the trial court.

LEGAL ANALYSIS

I. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 8. McGruder argues that the jury verdict was against the overwhelming weight of the evidence. He contends that the State failed to present sufficient evidence to establish beyond a reasonable doubt that he committed the crimes of murder and arson. He claims that the State presented no direct, eyewitness testimony linking him to the crimes. The State argues that based on evidence the jury actually heard, there was sufficient evidence to support the jury verdict.
¶ 9. The standard of review for determining whether a jury verdict is against the overwhelming weight of the evidence is well-settled. The appellate court must accept as true all evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Swann v. State, 806 So.2d 1111, 1117 (¶ 25) (Miss.2002). On review, the State is given "the benefit of all favorable inferences that may reasonably be drawn from the evidence." Griffin v. State, 607 So.2d 1197, 1201 (Miss.1992). The appellate court should not reverse a guilty verdict unless failure to do so would sanction an unconscionable injustice. Hilliard v. State, 749 So.2d 1015, 1016-17 (¶ 10) (Miss.1999). "This Court does not have the task of re-weighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible." Langston v. State, 791 So.2d 273, 280 (¶ 14) (Miss.Ct.App.2001).
¶ 10. Looking at the record, the State offered the testimony of twelve witnesses to prove its case against McGruder. Lindberg Moore, the Yazoo City Fire Chief, testified that he went inside the house at 617 Grady Avenue on June 23, 1998, to discover the smell of decayed flesh. He saw a decayed body on a cot-like bed in the living room and saw another body in the rear of the house. Carl Rayfield, the State Deputy Fire Marshal, testified that he too smelled decayed bodies upon entering the house. Rayfield's job was to determine the cause of the fire. While investigating, Rayfield did not observe any accidental sources of ignition such as the water heater. He did notice three separate fires, one in the front living room and two in the back bedrooms. He determined the cause of the fires was arson.
*31 ¶ 11. James Jackson, the Yazoo City Fire Marshal, testified that he saw a blood trail in the hallway leading to the back bedroom where Dixon's body was found. Jackson also testified to the three separate fires and he stated the fires were started by available materials like clothes or sheets. Larry Davis, a detective with the Yazoo City Police Department, also testified to seeing the blood trail in the house where the bodies were found. He stated that he was present when McGruder gave the first statement to police. McGruder told police that he left the house at 10:00 a.m. to go to work. He also mentioned a conversation with his grandmother, Daisy Shinal, where he allegedly told Shinal she should move back into her trailer. Shinal was apparently concerned after someone stole some patio furniture from her home.
¶ 12. Douglas Ware, the director of personnel at Peco Foods in Sebastopol, Mississippi, testified that McGruder was hired to work at the Peco plant in the deboning area. Ware stated that McGruder worked at Peco for one day, June 22, 1998, for 7.63 hours. According to Peco work records, McGruder worked from 3:15 p.m. until 11:23 p.m. Ware testified that it was a one and one-half hour bus trip from the plant back to Yazoo City. John Isonhood, the owner of A & J bus company, testified that his buses transport workers from the Peco Foods plant back to Yazoo City. He stated that the shift McGruder was working typically ends at 11:45 p.m. The bus waits fifteen minutes after the shift ends before leaving for Yazoo City around 12 midnight.
¶ 13. Cindy Heidel, a nurse, testified that Willie Dixon was her patient in June of 1998. She recalled stopping by Dixon's home on Friday, June 20, 1998, around 9:00 a.m. to check on Shinal and Dixon. Heidel said she went by the house on Monday, June 23, 1998, before lunch, probably around 11:00 a.m. She never saw Shinal or Dixon that day because McGruder was waiting in the carport and told her that Shinal and Dixon were not home. McGruder told Heidel that Dixon was sick and was taken to the hospital. Heidel thought the story sounded strange and after investigating the matter further, Heidel discovered that Dixon was not seen by a nurse or doctor at the hospital in Yazoo City.
¶ 14. Verba Young, an acquaintance of McGruder, testified that she and McGruder went over to Shinal's home on Saturday, June 21, 1998, around 3:00 a.m. Young stated that she and McGruder were smoking crack together. While inside the house, Young saw an elderly lady in a bed in the front living room with the bed covers up over her face. When Young inquired as to why the lady was not moving, McGruder told her that Shinal had taken her blood pressure medication and was sleeping. Young said that she left the house several times to get more drugs and each time she returned, Shinal was in the same position in the bed with the covers over her face.
¶ 15. Dr. Steven Hayne, a pathologist who performs autopsies for the State of Mississippi, testified that he conducted autopsies on Shinal and Dixon and found that both had post-mortem burns. Dr. Hayne determined Shinal's cause of death as manual strangulation. He determined that Dixon died as a result of a blunt force head trauma. Dr. Hayne stated that both Shinal and Dixon died between two and four days before the fire occurred.
¶ 16. Herbert Grayson, a witness to the fire, testified that he first saw the fire around 1:00 a.m. He and two others attempted to kick down the front door but they were unsuccessful. Bobby Adam, Chief of Police, testified that McGruder was arrested after several conversations with witnesses made McGruder the primary *32 suspect in the murders and arson investigations. Adam was present when McGruder gave a second statement to police. During the questioning, McGruder admitted to having a "confrontation" with Shinal. He admitted that he hit Shinal. McGruder also admitted to hitting Dixon and knocking him down. Adam testified that McGruder told police that Dixon fell to the ground and was bleeding. McGruder then dragged Dixon down the hall and into the bedroom.
¶ 17. Reviewing these facts in a light most favorable to the State, a reasonable juror could infer that McGruder was guilty of two counts of murder and one count of arson beyond a reasonable doubt. The weight of the evidence against McGruder demonstrates that sufficient proof was offered by the State for the jury to find McGruder guilty of the murders of Daisy Shinal and Willie Dixon and of arson pursuant to Mississippi Code Annotated Sections 97-3-19(1)(a) and 97-17-1 (Rev.2000).

II. DID THE STATE COMMIT REVERSIBLE ERROR DURING ITS CLOSING ARGUMENT BY MAKING IMPROPER REMARKS WHICH APPEALED TO THE BIAS AND PREJUDICE OF THE JURORS?
¶ 18. McGruder claims that he was denied his right to a fair and impartial trial because the State argued facts not in evidence and indulged in inflammatory remarks in order to incite bias and prejudice in the jurors. McGruder cites to specific statements in the record. The prosecutor said the following during closing arguments:
He [McGruder] came in and he put bed clothes in the man's bedroom where he was, went on in the room where Ms. Daisy was, pull all those clothes and set fire to them to hide his evil deed and save his sorry butt.
His grandma was wanting him to leave. She was bothering him. He was bothering her at 82 years old, and he got mad with her because she told him to get out of the house, and he got mad at her.
You're going to find that a liar, a doper, and a drinker is also a grandmother and uncle killer. That's what he did. He did it because they tried to move him out.
She had to be struggling during that period of time to get away from him. He knew exactly what he was doing, because you don't kill somebody by strangling them in a matter of a few seconds. It takes a minute or two to cut their air off. It takes that period of time for the life to go out of them, for them to become unconscious because they have no oxygen to their brain. It cannot be anything other than an intentional act, and if it's an intentional act, it's murder. It's not manslaughter.
¶ 19. McGruder argues that by the State making these remarks, he was denied a fair trial. He contends that such remarks by the State constituted "plain error" and grounds for reversal.
¶ 20. The State argues that since McGruder's trial counsel did not contemporaneously object to the remarks, his claim is procedurally barred. The record does not contain any objection by McGruder's counsel to these remarks. In order to perfect the issue for appeal, counsel must make a contemporaneous objection. Otis v. State, 853 So.2d 856, 864 (¶ 23) (Miss.Ct.App.2003). The State also argues that such remarks by the prosecutor were within the limits of a reasonable argument.
It is well-settled that "counsel is allowed considerable latitude in the argument of cases and is limited not only to the facts presented in evidence, but also to deduction and conclusions he may reasonably *33 draw therefrom, and the application of the law to the facts." Wells v. State, 698 So.2d 497, 506 (Miss.1997) (citing Ivy v. State, 589 So.2d 1263, 1266 (Miss.1991)). This Court has also stated that where the argument does not result in "unjust prejudice against the accused as to result in decision influenced by the prejudice so created, this Court will find it harmless." Wells, 698 So.2d at 507 (quoting Davis v. State, 530 So.2d 694, 701 (Miss.1988)).
Sanders v. State, 801 So.2d 694, 704 (¶ 39) (Miss.2001). McGruder asks this Court to find plain error and reverse his conviction.
¶ 21. The State argues that McGruder's conviction should not be reversed because of the procedural bar and because the remarks did not rise to the level of plain error. In a recent case, the Mississippi Supreme Court has held that even with an improper argument, the remarks made by the State did not rise to the level of plain error which would require reversal. Ishee v. State, 799 So.2d 70, 75 (¶ 13) (Miss.2001). In Ishee, the court stated:
Here, again we find the argument to be improper, but it does not constitute reversible error for two reasons. First, Ishee did not object to the argument in the trial below. This Court has no original jurisdiction, and "it can only try questions that have been tried and passed upon by the court from which the appeal is taken." Patrick v. State, 754 So.2d 1194, 1196 (Miss.2000) (citing Leverett v. State, 197 So.2d 889, 890 (Miss.1967)). Further, we do not find that the prosecutor's arguments rise to the level of impropriety that would warrant reversal as plain error.
Id. In that case, the prosecutor made the "send a message" argument to the jury during closing arguments. While the court admonished this type of remark, it did not rise to the level of reversible error.
¶ 22. In the case sub judice, the State took advantage of the wide latitude given during closing arguments. The State could properly argue its theory of the case, apply the law to the facts, and make deductions and conclusions based on the evidence presented. There was evidence presented that McGruder lied to Cindy Heidel about Dixon being sick and at the hospital. Verba Young testified that she and McGruder were smoking crack for several hours on the Saturday prior to the fire. There was also evidence of how the fires were started and of a confrontation between McGruder and his relatives. We find that McGruder's argument that the prosecutor's remarks were reversible error fails because it is procedurally barred, and alternatively it is without merit.

III. DID THE CUMULATIVE EFFECT OF THE ENUMERATED ERRORS DENY THE APPELLANT A FUNDAMENTALLY FAIR TRIAL?
¶ 23. McGruder argues that the combination of the jury's reliance on weak circumstantial evidence and the State's closing remarks denied him a fundamentally fair trial. We have held that the jury verdict was not against the overwhelming weight of the evidence and that the closing remarks of the State did not rise to reversible error. We have found no errors to exist on the arguments McGruder raised on appeal. Following the rationale of Weeks v. State, 804 So.2d 980 (Miss.2001), finding no reversible errors for each issue, we find that there is no cumulative effect for the errors McGruder alleges. Weeks, 804 So.2d at 998 (¶ 71). McGruder had a fundamentally fair and impartial trial.
¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF YAZOO COUNTY OF CONVICTION OF COUNT I, MURDER AND SENTENCE OF LIFE; COUNT II, MURDER AND SENTENCE OF LIFE TO RUN CONCURRENTLY *34 TO SENTENCE IN COUNT I; COUNT III, ARSON AND SENTENCE OF TEN YEARS TO RUN CONSECUTIVELY TO SENTENCES IN COUNTS I AND II, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF APPEAL ARE ASSESSED TO YAZOO COUNTY.
KING, C.J., BRIDGES AND SOUTHWICK, P.JJ., THOMAS, IRVING, LEE, CHANDLER AND GRIFFIS, JJ., CONCUR. THOMAS, J., CONCURS WITH SEPARATE WRITTEN OPINION.
THOMAS, J., Concurring.
¶ 25. I totally concur with the merits of the majority's disposition of McGruder's appeal; this case is a no-brainer insofar as it ought to be affirmed. I write separately to express my concern with the supreme court's handling of this case procedurally and the handling of the appeal docket in general. I shall explain.
¶ 26. After McGruder appealed and all briefs were finally filed, the clerk of the court validated the case, which is to say, notified our courts all was ready for a ruling. After validation by the clerk, the case was sent to the central legal office at the supreme court for a review and recommendation as to whether the case should stay at the supreme court or be sent to the court of appeals. On a rotating basis, one of the supreme court justices reviews the central legal recommendation and signs an order to either have the supreme court retain the case or send it to the court of appeals. On August 19, 2002, the supreme court ordered that this case be sent to this Court for disposition. Thereafter, the case was assigned to a writing judge at random. The procedure is the same at the supreme court. The case then went to a three judge panel; after discussion and a decision, the writing judge wrote an opinion for the panel. After all three judges agreed on the opinion, the same was then circulated to all ten members of this Court.
¶ 27. In this case, all panel members concurred in the opinion, and ultimately all ten members of this Court concurred. A 9-0 opinion was released by this Court on January 21, 2003. See McGruder v. State, 835 So.2d 104 (Miss.Ct.App.2003). The mandate of the Court was issued on February 11, 2003. McGruder never filed a motion for rehearing, but on February 19, 2003, twenty-nine days after the decision was handed down, McGruder filed a "motion for time to file rehearing out of time," not a motion for rehearing but a motion for additional time. See M.R.A.P. 40. This motion was denied by this Court on February 21, 2003. A petition for certiorari was then filed by McGruder on March 6, 2003, despite the fact that McGruder never filed a motion for rehearing and this Court never ruled on a motion for rehearing. See M.R.A.P. 17(b). On May 29, 2003, the Supreme Court entered an order giving that court additional time to consider the petition for cert, despite the fact that M.R.A.P. 17(e) states that "[t]he Supreme Court shall act upon a petition for cert within ninety (90) days of the filing of the response.... The failure of the Court to issue such a writ within that period shall constitute a rejection of the petition and the petition shall be deemed denied." Nothing in the rule adopted by the Supreme Court even suggests that the Court may delay its decision.
¶ 28. On June 26, 2003, some 112 days after cert was filed, the Supreme Court granted cert. Seventy-seven (77) days later (or 189 days since cert was filed), on September 11, 2003, the Supreme Court released its decision reversing our opinion by holding that the procedural bar which we had applied to McGruder's appeal *35 should not apply, and that we should have reached the merits of the case.[1] However, without any explanation, the Supreme Court then bounced the case back to this Court for a ruling on the merits. Of course, after the Supreme Court's ruling, the State had the right to file a petition for rehearing but they did not, and we received the case on October 2, 2003, (270 days starts again) for a decision on the merits. After this new decision is released, McGruder then has fourteen (14) days to file a petition for rehearing with us. Assuming it is denied, he will then have fourteen (14) days to file a petition for cert with the Supreme Court, which may of course grant or deny. Without question, and particularly in view of the fact this is a criminal case wherein the defendant received a life sentence (and all the defendant has is time), this case no doubt will wind up right back in the hands of the Supreme Court for a decision  either by a denial of cert or a new opinion if they grant cert.
¶ 29. This case is a monumental and unfortunate classic example of a waste of judicial economy and time.
¶ 30. I care not that the Supreme Court reversed us. My disgust is over the fact that once the Supreme Court initially granted cert that it did not go ahead and rule on the merits  this was not a complicated or voluminous case.
¶ 31. Since 1995, when this Court came into existence, specifically to help the Supreme Court alleviate its overcrowded docket, our appellate courts have issued the following number of written opinions (I do not count cases dismissed after the appeal notice is filed because that requires nothing more than a judge's signature on a form order):

Decisions on the Merits

 Supreme Court Court of Appeals
 1995 565 525
 1996 500 636
 1997 484 706
 1998 437 758
 1999 420 620
 2000 282 579
 2001 331 548
 2002 313 610
 2003 297* 543
* These represent the "official" numbers from the Supreme Court,
but a cursory check against their decision lists shows that the actual number
of decisions was more like 218.

¶ 32. It is readily apparent that the Court of Appeals is handling an overwhelming amount of the docket. I am not complaining about that. We have handled the numbers we have now and have handled even more in the past, all within the time the rule and law provides while we were trying to help get the backlog out of the way.
¶ 33. My complaint is on behalf of the trial bench, the bar, the litigants in the cases on appeal and the public in general.
¶ 34. Overloading this Court creates delay  obviously it is easier and quicker to get out, say, ten opinions than five opinions during a term (we each have six terms of eight weeks each).
¶ 35. We all can do more. This Court has handled more than its fair share in the past and can and will do so if need be in the future.
¶ 36. The simple and plainly verifiable fact of the matter is that our Supreme Court is not timely and efficiently handling the docket it keeps, and unfortunately, in this particular case, has delayed a final result on a final decision coming out of this *36 Court. This is not the first time.[2] There was simply no need to send this case back to us.
¶ 37. At present this Court handles all workers' compensation cases direct. We now handle all post-conviction relief cases except those wherein the death penalty has been imposed, a very few a year. We are also getting 80% of all direct criminal appeals except those, again, where the death penalty has been imposed. We also are getting more than our fair share of regular civil cases. All of this is being done with considerably less staff, and staff I might add, which by dictate from the Supreme Court without our input, is paid less than that of Supreme Court personnel. Contra Miss.Code Ann. § 9-4-13(2) (Rev.2002).
¶ 38. The Supreme Court has acknowledged it has been slow, that it has taken too long to rule but that it is changing and will do better, be more efficient, and rule more quickly. All of that may be true, but it has not happened in almost ten years. If change does come about, it is obvious it is only going to occur because they have and will continue to dump the bulk of the load on this Court.
¶ 39. Problems in the appellate system can always cause delay, i.e., a judge may have to take a leave of absence, a judge may die or be defeated at the polls and the replacement then has to get up to speed so to speak, or a judge may be distracted by having to run for reelection. Problems aside, they serve as no valid excuse for the court as a whole to get behind; others should take up the slack, if any, for the short term.
¶ 40. Attributing delay over the fact some cases are allegedly harder or more complex is nothing more than an excuse for doing less and taking longer to rule. Anyone who believes or exposes the "hard and complex" argument is either a liar or needs to take a serious check with reality.
¶ 41. The old saying that "justice delayed is justice denied" is a truism that speaks volumes in what I am saying.
¶ 42. A rule that allows cameras in the courtroom (which I have always endorsed but which any trial judge on any given case can disallow), a rule which tries to stop forum shopping for a "friendly" court (which I endorse but which could have been handled quicker by slapping down the attorney and/or trial judge), a rule which attempts to stop the bunching of numerous unrelated cases in one friendly court and other such rules all sound nice and play well in a gullible media but ultimately have little impact on the administration of justice in this State.
¶ 43. As a former trial judge for twelve years, and after having sat on this Court for over nine years, one of the statements I have heard most often from the bench and attorneys is to the effect that they may or may not agree with our decision but they would at least like to see us render a quick and clear opinion so that they can more readily go on about their business. The bench, bar, litigants and *37 public deserve no more, and we certainly ought to give them no less.
¶ 44. The comments I make herein are not to be taken as disrespectful of any individual or institution. Quite the contrary, it is because of my high regard for our judicial system and the members of the bench, bar, and populace that must live within it that I express my consternation with the way things are because I believe our system can do better, with not much effort.
NOTES
[1] Miss.Code Ann. § 9-4-3(5) (Rev.2002) provides: "The Supreme Court shall issue a decision in every case received on certiorari from the Court of Appeals within one hundred eighty (180) days...."
[2] See Smith v. Parkerson Lumber, Inc. 2001-CA-00409, wherein cert was filed on July 30, 2002, but a ruling thereon was delayed by seven (7) orders of extension. When cert was ultimately granted on July 17, 2003, 849 So.2d 899 (Miss.2003), the Court thereafter entered a decision on October 9, 2003, ___ So.2d ___ (Miss.2003), reversing us and holding, like McGruder, that we were wrong to apply a procedural bar to an appeal (Smith was civil). Again, like McGruder, rather than rule on the merits, the case was bumped back to us for a ruling on the merits. See also Forkner v. State, 2001-CT-00754 SCT (Miss. Apr. 15, 2004); Deloach v. State, 2001-CT-01490 SCT, ___ So.2d ___, 2004 WL 1066818 (Miss. May 13, 2004).